IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WANDA SMITH,

    Plaintiff,

      v.

COBB COUNTY SCHOOL
DISTRICT,

    Defendant.

CIVIL ACTION FILE
NO. 1:10-CV-848-TWT

## OPINION AND ORDER

The Plaintiff in this case was a school bus driver for the Cobb County School District who claims that she was terminated for speaking out at public school board meetings. However, the Plaintiff is unable to show that the school district's board violated her rights explicitly or pursuant to a custom or policy of rubber stamping subordinate decisions.

## I.  Background

Defendant Cobb County School District ("CCSD" or the "District") is the body that provides public education to the children of Cobb County, Georgia. CCSD utilizes 1,100 buses and employs 800 drivers to provide the daily transportation needs of its students. The Plaintiff, Wanda Smith, worked as a special needs school bus

driver from 1988 until April 23, 2009, when she was terminated. (See Pl.'s Statement of Facts in Opp'n to Def.'s Mot. for Summ. J., ¶¶ 1-4).

The transportation department within CCSD drew public attention during the time period at issue. A Cobb County grand jury was convened in January 2010 to investigate allegations by bus drivers and mechanics concerning mismanagement, management through fear, and safety infractions. (See Abraham Dep. Ex. 10, at 9).[1] The grand jury found that the District's bus fleet was extremely old and that there was no plan for obtaining new buses. The grand jury further found that bus maintenance records were in shambles, that there were no written procedures for mechanics, and that eight of the fourteen lifts used in bus maintenance were unsafe. (Id. at 9-12). The grand jury's investigation noted that "the drivers and mechanics work in an environment of intimidation and 'virtual fear' of losing their jobs – it is palpable and we heard and saw it time and again." (Id. at 14). The grand jury stated that transportation employees "have no faith in that chain of command." (Id.) The investigation concluded by calling for "[a]n audit of Human Resources practice of hiring and firing both Fleet Maintenance Mechanics and Bus Drivers to assure fair and

---

[1] The Defendant objects to the admissibility of the grand jury report and to the admissibility of various newspaper articles that the Plaintiff cites in her statement of material facts, as well as the result of Georgia Department of Labor determinations on unemployment benefits. Because the Court ultimately concludes that the Plaintiff cannot establish municipal liability even with this evidence, the Court need not resolve the Defendant's objections.

equal treatment.  In addition, an audit should be performed to assure all requirements of the [employee handbook] concerning employee relations, employee evaluations, notifications of deficient performance, hiring and firing practices, etc. are strictly followed."  (Id.)

Smith spoke at the Cobb County School Board of Education (the "Board") meeting on August 28, 2008, about compensation issues and the human resources departments' treatment of personnel.  On September 2, 2008, Smith, who was the president of the Transport Workers Union, Local 249 ("Local 249"), and other union leaders expressed concerns that the human resources department ("HR") was applying discipline unequally as a tactic to manipulate employees.  Smith spoke again at a Board meeting on September 25, 2008, identifying issues with compensation and bus driver licensing.  On December 11, 2008, Smith spoke critically of a proposed $2 million expenditure for Global Positioning Systems ("GPS") on all department vehicles, stating that bus drivers already had two-way radios and onboard cameras and that the money could be better spent elsewhere.  (Pl.'s Statement of Facts in Opp'n to Def.'s Mot. for Summ. J., ¶¶ 65-71).

On December 16, 2008, the Marietta Daily Journal ("MDJ") reported on the criticism of the GPS proposal and quoted Smith's comments before the school board. The GPS proposal was pulled from the December 2008 agenda.  Smith alleges that

soon after, when her bus broke down and maintenance did not immediately reach her, Rick Grisham, the director of transportation, stated "if you would have not spoke[n] out against the GPS, then we would have known where you are." (Id. ¶¶ 72-77).

Smith again spoke about regulations impacting transportation employees at the February 6, 2009, Board meeting. And in March, Smith and the Local 249 union invited Board chairman John Abraham to a union meeting to discuss two primary complaints about CCSD's transportation – that buses were no longer being maintained properly and that driver concerns were being ignored by management. At the March 26, 2009, Board meeting, Smith criticized the accountability of District management and criticized specific features of the new special needs buses that the District had purchased, suggesting that the buses were not safe for children. Smith also emphasized the very low morale of the transportation department's mechanics who felt constrained by new management. Grisham responded in writing to Smith's March 26 statements, stating that, in his opinion, "a Board of Education Meeting is not the platform to bring employee/employer relations for the world to see and hear." (Id. at ¶¶ 81-95; 102; Grisham May 31, 2012 Dep., Ex. 62, at 4).

On April 15, 2009, Smith drove her bus to the CCSD central office to attend an advisory committee meeting that would include union member drivers. Grisham saw a bus parked outside the central office. He informed human resources which

conducted an investigation and held a meeting with the Plaintiff on April 20, 2009. At the April 20 meeting with Smith, human resources informed Smith of its recommendation to terminate her.  Smith was cited for using her bus for personal reasons, including parking her bus at the central office on April 15.  Smith contends the regulations in place allowed her to park her bus at the central office.  Smith was also cited for excessively fueling her bus. The Defendant contends Smith had a history of violating district policy  dating back to 1989 and that Smith was terminated pursuant to the District's progressive discipline policy.  Prior to the meeting where the Board was scheduled to review Smith's termination recommendation, Smith reached out to several Board members and claimed she felt she was going to be retaliated against for speaking out at Board meetings.  (Id. at ¶¶ 110-32; 146-47).

In general, the CCSD Board must approve the termination of any bus driver. (Finlayson Dep. at 153).   When it receives a recommendation to terminate an employee, the Board holds a closed-door "executive session" with the Board members, the superintendent, the chief human resources officer, and the District's attorney.  (Dunnigan Dep. at 55-58).  At the executive session, each Board member would receive a report generated by human resources listing the reasons why human resources felt the employee should be terminated.  (Id. at 50-53).  During the meeting, the chief human resources officer would walk the Board through the report and

discuss any questions the Board had, and the Board would often engage in a discussion about the recommendation.  (Bartlett Dep. at 33-34).  When the Board approved the recommendation to terminate the Plaintiff in this case, it was comprised of John Abraham, the chairman, David Banks, Alison Bartlett, Holli Cash, John Crooks, Lynnda Crowder-Eagle, and David Morgan.

The Board reviewed the recommendation to terminate the Plaintiff on April 23, 2009.  Smith appeared before the Board and informed the Board she believed she was being terminated in retaliation for speaking at Board meetings and called for an investigation of the CCSD.  Nevertheless, the Board approved Smith's termination. Smith contends the reasons for her termination varied, with an executive summary listing speeding, suspension of her commercial driver's license, job performance concerns, and using the bus for personal reasons, the human resources report listing more than ten reasons, and her termination letter itself listing incidents dating back to 1989.  (Id. at ¶¶ 133-42; 148).

The Plaintiff contends she was impermissibly terminated for speaking out against her employer.  She seeks to recover from CCSD under 42 U.S.C. § 1983 for violations of her First Amendment rights.  The Defendant has moved for summary judgment, arguing that the Plaintiff cannot establish municipal liability and that she has not shown that she engaged in protected speech.

## II.   Motion for Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III.   Discussion

### A.    CCSD's Liability Under Monell

The Defendant argues that the Plaintiff is unable to hold CCSD liable under the standard set forth in Monell v. Department of Social Services, 436 U.S. 658 (1978).  "[M]unicipalities may not be held liable for constitutional deprivations on the theory of respondeat superior."  Doe v. School Board of Broward County, Florida, 604 F.3d 1248, 1263 (11th Cir. 2010).  "A municipality may be held liable 'only if such constitutional torts result from an official government policy, the actions of an official

fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law.'" Id. (quoting Denno v. School Board of Volusia County, Fla., 218 F.3d 1267, 1276 (11th Cir. 2000)).  "In addition to identifying conduct attributable to the municipality, a plaintiff alleging municipal liability under § 1983 must show that 'the municipal action was taken with the requisite degree of culpability, i.e., that the municipal action was taken with deliberate indifference to its known or obvious consequences.'" Id. (quoting Davis v. DeKalb County Sch. Dist., 233 F.3d 1367, 1375-76 (11th Cir. 2000)).  Further, "Monell's policy or custom requirement [] preclude[s] § 1983 liability for a subordinate official's decisions when the final policymaker delegates decisionmaking discretion to the subordinate, but retains the power to review the exercise of that discretion." Id. at 1264 (quoting Scala v. City of Winter Park, 116 F.3d 1396, 1399 (11th Cir. 1997)).

"Determining the persons or bodies that have final policymaking authority for the defendant is a matter of state law." Id. at 1264.  The parties agree that, under Georgia law, the CCSD Board holds final policymaking authority for the District.  The Plaintiff contends that her termination was the result of: (1) a pervasive custom or practice by which the Board failed to provide meaningful review of termination recommendations which allowed CCSD to develop a custom and practice of

unconstitutional retaliation leading to the Plaintiff's termination; and (2) the actions of a final policymaker, because the Board, as final policymaker, approved the recommendation to terminate the Plaintiff.  (See Def.'s Br. in Supp. of Def.'s Mot. for Summ. J., at 27).

The Defendant argues that the Board provides a sufficient level of review of termination recommendations such that there is not a custom or practice within CCSD of rubber stamping termination recommendations.   Therefore, any retaliatory motivation of subordinate employees, such as Transportation Director Rick Grisham, is not attributed to the District.  The Defendant further argues that the Plaintiff has not shown any evidence of a policy or custom which could lead to municipal liability and that the Plaintiff must therefore establish that the Board sanctioned the violation of the Plaintiff's rights, which the Plaintiff cannot do.

The Plaintiff is unable to show that the Board had a custom or policy of rubber stamping termination recommendations.  "A municipality's failure to correct the constitutionally offensive actions of its [transportation] department may rise to the level of a 'custom or policy' if the municipality tacitly authorizes these actions or displays deliberate indifference towards the" offensive actions.  Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir. 1987).  Here, the evidence shows that the Board did not tacitly authorize and did not display indifference to termination decisions generally

or to the concern that employees were being retaliated against.  Instead, the evidence indicates that the Board was aware of retaliation concerns and addressed those concerns.

The Plaintiff not only notified individual Board members of her perception that she was being retaliated against prior to the Board meeting, but also spoke at the Board meeting where the decision to terminate her was approved.  This suggests that the Board members were well-aware of her concerns about retaliation and nonetheless approved the recommendation to terminate her employment.  There is nothing to suggest that the Board members ignored the Plaintiff's statements.  Indeed, Board member John Abraham specifically recalls discussing whether Smith was being terminated for speaking out and sought reassurances from HR that the termination recommendations were not based on reprisals for public speaking.  (See Abraham Dep. at 39-40).  Although Abraham and the Board did not conduct their own investigation, Abraham's testimony supports the conclusion that the Board was concerned about retaliatory motivations.  (See Abraham Dep. at 40-41 ("I knew Wanda [Smith] and knew that she was somebody that stuck out.  And other board members said the same thing.  And it was their concern that they wanted to make sure there wasn't a reprisal against her.  If she was a bad employee or was not, you know, up to snuff on her job performance, that's a whole nother story."); id. at 42 ("There

have been a number of cases I can recall … a couple of people that I wanted clarification, wait a minute, the person just said this and you're going to fire this person? … So. We would look at these very carefully for the most part. Everybody would."). Ultimately, Abraham stated that he voted in favor of terminating Wanda Smith based on the progressive discipline policy and based on the information he had of her previous rule violations and performance problems. (Id. at 49).

The testimony of the remaining Board members further indicates that the Board did more than rubber stamp the recommendation to terminate the Plaintiff or any other employee. While Board member Crowder-Eagle testified that she considered it unethical for the Board itself to independently investigate personnel recommendations from the Superintendent, she also stated that the Board could vote against the Superintendent's decision and that she had personally not supported a recommendation in the past. (Crowder-Eagle Dep. at 58-59). Likewise, the fact that Board member Alison Bartlett admits that she did not have a way to learn "what was going on behind the termination recommendation" for Smith other than the discussions at the Board meeting does not mean the Board merely rubber stamped termination decisions. (Bartlett Dep. at 38-39). Indeed, Bartlett also stated the Board could ask questions about termination recommendations and supporting investigations. (Id. at 30-31). Bartlett further stated that she voted to terminate the

Plaintiff because the Plaintiff had violated policy and that she had not heard any other Board member say they voted to terminate the Plaintiff due to her public speaking. (Id. at 64-65).  Further, Board member Crooks stated that at the meeting where Smith was terminated Bartlett and Crowder-Eagle both made inquiries concerning the recommendation to terminate Smith.   (Crooks Dep. at 59).   Additionally, the Defendant has shown that the Board has rejected termination recommendations in the past.  (See Adams Dep. at 37-38).  In sum, the Plaintiff has not established that there was a custom or practice by which the Board failed to conduct meaningful review of termination recommendations or that the Board tacitly approved the unconstitutional actions of subordinate employees.   See Brooks, 813 F.2d at 1193.   Therefore, retaliatory motivations of others – if they existed – are not attributed to the District and cannot be the basis of section 1983 liability.

Accordingly, the Plaintiff must show that a majority of the Board approved her termination in retaliation for protected speech.  The Plaintiff has not produced any evidence that the Board had a policy of retaliating against employees who exercised the right to speak at Board meetings. "Even in the absence of an express policy or custom, a local government body can be held liable 'for a single act or decision of a policymaking authority in the area of the act or decision.'"  Cuesta v. School Board of Miami-Dade County, Fla., 285 F.3d 962, 968 (11th Cir. 2002) (quoting McMillan

v. Johnson, 88 F.3d 1573, 1577 (11th Cir. 1996)).  "A policymaker's approval of an unconstitutional action can constitute unconstitutional [] policy only when the policymaker approves a subordinate's decision *and the basis for it*."  Matthews v. Columbia County, 294 F.3d 1294, 1297-98 (11th Cir. 2002) (quoting Gattis v. Brice, 136 F.3d 724, 727 (11th Cir. 1998)).  Here, as the above evidence shows, the Board took explicit steps to satisfy itself that reprisal for public speaking was *not* the basis for the recommendations to terminate Wanda Smith.  Board member Abraham testified that many Board members were concerned that Smith was being retaliated against, that they made an inquiry at her termination hearing, and that they understood that Smith was being terminated due to her job performance.  (Abraham Dep. at 40-42).  Smith herself contacted several Board members prior to her termination review and expressed her concern that she was being retaliated against and repeated the same allegation at the Board meeting where the recommendation to terminate her was approved.

In Matthews, the county defendant appealed following a jury verdict in favor of the plaintiff on section 1983 liability.  The jury's special verdict concluded that one commissioner on the county's board of commissioners was motivated by the plaintiff's protected speech activity in approving the determination to terminate the plaintiff as part of a broad reduction in force.  The verdict further found that two other

commissioners on the five commissioner board were influenced by the first commissioner's improper motivation.   Only these three of the five total commissioners voted to terminate the plaintiff.  On appeal, the court reversed the trial court's denial of a judgment as a matter of law for the defendant following the jury verdict.  The court concluded that the facts did not establish municipal liability through a delegation or ratification theory.  With respect to a ratification theory, the court held that "[c]ounty liability on the basis of ratification exists when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority."  Id. at 1297 (quoting Bannum, Inc. v. City of Fort Lauderdale, 901 F.2d 989, 998 (11th Cir. 1990)).  The court concluded that the fact that two of the commissioners may have known about or been influenced by the third commissioner's unconstitutional motivations was insufficient itself to support a ratification theory.  The court reasoned that such a rule would hamper lawmakers who are aware of unconstitutional animus behind legislation but who nevertheless support the legislation on other grounds. "Because only [one commissioner] was actually motivated by unconstitutional consideration, the County cannot be held liable under Section 1983."  Id. at 1298 (quoting Mason v. Village of El Portal, 240 F.3d 1337, 1340 (11th Cir. 2001)).

Here, the evidence does not show that a single Board member was motivated to terminate Smith for any protected activity.  Indeed, the deposition testimony of several Board members shows that the Board took steps to ensure it was not approving any improper retaliation.  Abraham was specifically concerned that Smith was being retaliated against, and Crooks remembers two other Board members asking similar questions during the meeting.  (Abraham Dep. at 40-42; Crooks Dep. at 59).  Under Matthews, even if a Board member admitted that he or she was motivated to terminate Smith because of her protected activity, section 1983 liability will still not attach to CCSD unless additional Board members shared that animus.  See also Mason, 240 F.3d at 1340 (regarding the plaintiff's section 1983 retaliation claim, "there can be no municipal liability unless all three members of the council who voted against reappointing Plaintiff shared the illegal motive.").  The evidence does not show that a single Board member was motivated to terminate the Plaintiff due to her protected statements.  Accordingly, the Plaintiff cannot establish municipal liability and the Defendant's motion for summary judgment should be granted.

      B.     The Plaintiff's Protected Activity

Even if the Plaintiff could establish liability under Monell, the Defendant has provided ample evidence that the Plaintiff would have been terminated even in the absence of her protected activity.  In general,

> [f]or a public employee to sustain a claim of retaliation for protected speech under the First Amendment, the employee must show by a preponderance of the evidence these things: (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a "substantial part" in the employer's decision to demote or discharge the employee. Once the employee succeeds in showing the preceding factors, the burden then shifts to the employer to show, by a preponderance of the evidence, that "it would have reached the same decision ... even in the absence of the protected conduct."

Battle v. Board of Regents for Georgia, 468 F.3d 755, 759-60 (11th Cir. 2006) (citing

Anderson v. Burke County, Georgia, 239 F.3d 1216, 1219 (11th Cir. 2001)).  "In

cases where a plaintiff has shown a public employer acted under both lawful and

unlawful motives, the public employer cannot be liable if the evidence shows the

public employer would have arrived at the same employment decision even in the

absence of the allegedly protected activity."  Boldin v. Limestone County, 152 Fed.

Appx. 841, 846 (11th Cir. 2005) (citing Mt. Healthy, 429 U.S. at 287).   Further,

"[t]he Supreme Court has made clear that even if the Defendant's animosity toward

the [plaintiff's protected activity] played a 'substantial part' in the [Plaintiff's

termination decision], such animosity cannot salvage the job of an employee who

could have been fired anyway."  Douglas v. DeKalb County, Georgia, No. 1:06-cv-

0584-TWT, 2007 WL 4373970, at *4 (N.D. Ga. Dec. 11, 2007) (citing Mt. Healthy

v. Doyle, 429 U.S. 274, 286 (1977)).  The Plaintiff "may not use [her protected]

activities to provide a cloak of immunity" for poor job performance.  Id. at *3.

Accordingly, "[w]ading through the muck of swirling allegations is unnecessary, as

the Defendant[] need only advance one reason as to why [it was] justified in

terminating the Plaintiff."  Id. at *4 (citing Mt. Healthy, 429 U.S. at 286); see also

Pennington v. City of Huntsville, 261 F.3d 1262, 1269 (11th Cir. 2001) ("In … § 1983

lawsuits, the Supreme Court has recognized that an employer can avoid liability if it

can prove that it would have made the same disputed employment decision in the

absence of the alleged bias.").

Here, assuming that the Plaintiff did in fact engage in protected conduct, the

Defendant has provided numerous reasons for her termination sufficient to satisfy the

Mt. Healthy standard.  Although the Plaintiff continually disputed the disciplinary

actions taken against her, the record indicates that the Plaintiff violated policy several

times prior to her 2009 termination.  In 1989, the Plaintiff was disciplined for stopping

her bus to use an ATM while students remained on the bus.  (Smith Dep. Ex. 6).  In

1992, the Plaintiff was disciplined for putting regular gasoline into a diesel bus.

(Smith Dep. Ex. 8).  Later in 1992, the Plaintiff was disciplined for receiving a

speeding ticket for traveling 48 m.p.h. in a 25 m.p.h. zone.  (Smith Dep. Ex. 11).  In

1993, the Plaintiff was disciplined for leaving students unsupervised on the bus while

she went into a house and she was terminated from a summer driving position for

using her bus for personal reasons.  (Smith Dep. Exs. 11 & 12).  In 2000, she was issued a letter for being unavailable by radio despite the District requirement that she remain available by radio at all times.  (Smith Dep. Ex. 13).  In 2002, the Plaintiff received a letter of concern because she did not maintain the proper paperwork on her updated routes, despite a two-month grace period following an earlier review of her file.  (Smith Dep. Exs. 14 & 15).  The Plaintiff received a "needs improvement" annual evaluation in 2004.  (Smith Dep. Ex. 16).  The Plaintiff received two letters in 2005 addressing speeding violations.  (Smith Dep. Exs. 15, 17, 18).  On September 13, 2006, the Plaintiff was demoted from bus driver to bus monitor because she lost her commercial driver's license after receiving multiple citations.  She was also suspended for three days due to the citations.  (Smith Dep. Ex. 21).  The Plaintiff received a "meets expectations" annual evaluation on May 16, 2008.  (Smith Dep. Ex. 22).  Finally, on April 15, 2009, the Plaintiff drove her bus to a morning meeting of the Board of Education, without approval to pick up or drop anyone off.  (Smith Dep. at 202-04).  While Smith claims that parking her bus at the central office was not forbidden, her infraction was using her bus for personal reasons, not parking at that specific location.  (See Mills Dep. at 128-31).  After discovering this, an investigation of the Plaintiff's violation was initiated.

The investigation's manager, Mary Finlayson, uncovered additional violations and ultimately recommended terminating the Plaintiff.  The investigation led to allegations that Smith had been padding her time card, excessively fueling her bus to further pad her time card, continuing to fail to update her route pursuant to District policy, and using her bus for personal reasons.  (Finlayson Dep. Ex. 47).  Finlayson recommended Smith's termination pursuant to the District's progressive discipline policy.  Finlayson noted in her deposition that the Plaintiff had been directed on three occasions prior to her termination infraction not to use her bus for personal reasons. (Id. at Vol. III, 44-45).  Both the Director of Employee Relations, John Adams, and Grisham also recommended the Plaintiff's termination.

The Court concludes that the Plaintiff's history of policy violations provided sufficient grounds for the Plaintiff's termination.  Even if the Plaintiff had shown that the recommendation for her termination was based in part on unconstitutional motives, the Defendant has provided evidence to show that, based on her job performance history, the Plaintiff would have been terminated anyway.  See Douglas, 2007 WL 4373970, at *4 (noting that Mt. Healthy cautions against elevating employees to a better position than they would have been in "simply because they engaged in constitutionally protected conduct"); Mt. Healthy, 429 U.S. at 286 ("A borderline or marginal candidate… ought not to be able, by engaging in [protected

conduct], to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision."). Accordingly, the Defendant's motion for summary judgment should be granted.[2]

## IV.  Conclusion

For the reasons set forth above, the Defendant's Motion for Summary Judgment [Doc. 176] is GRANTED.

SO ORDERED, this 7 day of August, 2013.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge

---

[2] Because the Court concludes that the Plaintiff cannot establish municipal liability and cannot overcome the Defendant's Mt. Healthy argument, the Court need not address whether the Plaintiff's speaking before the Board was protected conduct.